Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 9/17/2025 10:00 AM

FILED
7/15/2025 3:28 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L008904
Calendar, B
33575145

FILED DATE: 7/15/2025 3:28 PM   2025L008904

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

LAWRENCE J. SPINO,

    Plaintiff,

v.

LYFT, INC.;

    Defendant.

No.: 2025L008904

**Plaintiff Demands a Jury Trial**

## COMPLAINT AT LAW

Plaintiff, LAWRENCE J. SPINO, by and through his attorneys, ROMANUCCI & BLANDIN, LLC, complains against Defendant LYFT, INC., pleading hypothetically and in the alternative, states as follows:

### PARTIES

1. Plaintiff Lawrence J. Spino is an individual and citizen of Cook County, State of Illinois.

2. Lyft, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Since 2012, Lyft operated a transportation network company that provided services to the public for money. Lyft developed and placed into the stream of commerce a mobile application that permits individuals who wish to provide rides using an automobile to connect with application users who, ostensibly, seek rides. Would-be riders are then provided, via the Lyft App, with information about the driver, including the vehicle type. Lyft operates its ridesharing platform in every state in the U.S.A., including Illinois, and across the world.

3. Venue is proper in Cook County, Illinois as the events complained of occurred in Cook County, Illinois.

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

## FACTUAL ALLEGATIONS

4. This action arises from the June 23, 2024 carjacking that led to the shooting and paralysis of Plaintiff, LAWRENCE J. SPINO, a young driver whom Lyft matched with a supposed customer who, upon information and belief, opened their account moments earlier with unverified and fabricated personal information and an unverified form of payment.

5. Lyft knew its drivers—essentially players in the wildly profitable Lyft enterprise—were at high risk of violent assault by passengers, yet Lyft abdicated its duty to those drivers to protect them from that risk using simple, available, effective measures.

6. Since its founding in 2012, Lyft has grown rapidly into a multi-billion-dollar enterprise with operations worldwide. Lyft's phenomenal growth is due in large part to its success in finding ways to shift its cost of business to drivers, whom it has attempted to lobby to treat as independent contractors, its evasion of regulation governing other for-hire driving services, and lax security screening processes.

7. For decades, simple and inexpensive safety measures have been utilized that protect for-hire drivers from assault, including installation of barriers between the front and back seats, audio and video surveillance, and other measures. Yet Lyft did nothing to ensure that LAWRENCE J. SPINO had the benefit of such protections, nor did it even warn LAWRENCE J. SPINO of the importance of such protections.

8. Lyft has developed and commercialized some of the most sophisticated data collection and analysis in the world and purportedly screens out potentially violent or dangerous drivers from offering rides. But here it failed to employ basic identity-verification, age verification, GPS coordinate verification technology, and data pattern analysis to screen out the four individuals who shot and paralyzed LAWRENCE J. SPINO—even though, upon information and belief, the Lyft

2

account used to secure the ride at issue was not in their name, had not been ordered from their location, and was using an unverified form of payment.

9. Lyft knows, and has known since its founding, that drivers were at risk of carjacking and assault by passengers and does nothing to adequately screen new customers, verify accounts, and through their application, discourages and incentivizes drivers from using their own judgment to avoid potentially unsafe situations by penalizing them for failing to accept rides.

10. As a direct and proximate result of Lyft's failure to take simple and available steps to protect Plaintiff from potentially violent customers, he was carjacked and shot, left for dead, and was paralyzed on June 23, 2024, after driving individuals from Evanston, Illinois to Chicago, Illinois, that Lyft knew or should have known were intent on causing him harm and stealing his car.

11. Lyft's conduct evinces a conscious and corporate policy of "profits over people" characterized by a willful and knowing disregard for the rights and safety of others.

**I. LYFT KNOWS ITS DRIVERS FACE A VERY HIGH RISK OF ASSAULT AND HAD ACTUAL KNOWLEDGE PRIOR TO LAWRENCE J. SPINO'S SHOOTING THAT ITS DRIVERS HAD BEEN SUBJECT TO VIOLENCE BUT FAILED TO TAKE REASONABLE STEPS TO PROTECT ITS DRIVERS, INCLUDING LAWRENCE J. SPINO, FROM THAT RISK.**

12. The occupation of a driver for a ride-hailing service, whether the ride is hailed by phone call, by app, or by an extended arm on the street corner, is among the most dangerous in the United States.

13. A 2010 OSHA publication, for example, notes that "Taxi drivers are over 20 times more likely to be murdered on the job than other workers." Lyft itself recently undertook investigating the problem of passenger assaults on drivers (as well as the highly publicized problem of driver

3

assaults on passengers). Lyft's own investigation found that ten people were killed in physical altercations and over 4,000 people were assaulted during Lyft rides from 2017-2019.

## II. MECHANISMS EXIST TO PROTECT DRIVERS BUT LYFT DOES NOTHING TO ENSURE THEIR INSTALLATION AND USE

14. The risk of passenger assaults on drivers can be mitigated. For decades, OSHA has recommended that companies offering for-hire car services employ physical and procedural precautions to protect drivers from the risk of assaults by passengers. Among the controls long recommended by OSHA, and supported by scientific studies, are physical barriers between drivers and passengers, and surveillance cameras.

15. In order to drive for Lyft, driver applicants' vehicles must be inspected and approved by Lyft. Vehicles are inspected as part of the driver's initial application, and then again on an annual basis. Lyft's inspection ensures the driver's car meets Lyft's standards for safety, presumably to protect passengers—such as functioning tires, doors, horn, brakes, lights, seatbelts and turn signals.

16. Despite knowing the risks of passenger assaults on its drivers and its control over vehicle safety features, Lyft does not provide or require any sort of safety measures in its drivers' cars to protect its drivers' features like a physical, bullet proof, partition between the driver and passenger seating, GPS tracking, or security cameras.

17. Nor does Lyft warn its drivers of those risks or train them to identify particularly dangerous situations, neighborhoods, or passengers.

4

## III. LYFT DOES NOT USE ITS TECHNOLOGICAL CAPABILITIES TO SCREEN OR IMPLEMENT SAFETY MECHANISMS THAT MITIGATE THE RISK OF VIOLENCE AGAINST DRIVERS.

18. Lyft does not verify the identity of or screen new passengers for fraud, even though Lyft has the technology and ability to do so Lyft requires prospective Lyft drivers to pass background checks before they can begin accepting rides through the Lyft application.

19. In contrast, prospective passengers are not subject to any form of background check or identity verification process to open a Lyft account. Lyft does not perform even perfunctory screening of prospective passengers' payment information for fraud or stolen identity. To open an account as a passenger, an individual needs only input a phone number, email address, and payment method. Permitted payment methods include credit and debit cards, PayPal, Venmo, digital wallets, and Lyft gift cards.

20. Lyft allows users to scan or upload a photo of a credit card through the app. This entire process can be completed in a matter of minutes with fabricated information.

21. Lyft has elected not to screen new customers or implement identity checks despite its knowledge that drivers are about as likely as passengers to suffer a fatal physical assault during a Lyft ride. Indeed, while Lyft recognizes the need for vigorous background checks for drivers, individuals opening a new account are subject to essentially no screening before they get into the same enclosed space with an unprotected driver who has his or her back to the passenger and eyes focused on the road.

22. Lyft also has massive data collection and analysis capabilities that could be harnessed to identify and screen out users using fraudulent or stolen identities—if it chose to do so.

23. Lyft has allegedly and selectively chosen to implement such features in some markets— such as Minnesota—where it has announced riders who set up a Lyft account using an anonymous

5

form of payment—as co-defendants did here—will be required to provide a driver's license, state ID, or another type of document that shows their name or mailing address.

24. These technologies and procedures were known and available to Lyft prior to June 23, 2024.

25. In addition, knowing about the dangers Lyft exposes drivers to on a daily basis, Lyft has allegedly partnered and undertook to partner with ADT security to provide drivers with access to an emergency security button. Lyft states: "In an emergency, pilot users will be able to signal to ADT that they are in need of assistance, via an ADT-powered feature in the Lyft app. A user will then be connected to one of ADT's owned and operated monitoring centers, where an ADT security professional will alert authorities as needed so they can arrive at the user's location, equipped with detailed incident information."

26. The privacy section on Lyft's website discloses that it collects individual rider data including the following: name, email address, mobile number, rating(s), and the date signed up with Lyft; referral code(s) issued by Lyft; payment method information, such as the date the rider created and updated a payment method, the issuing bank's name, billing country, and payment method type; metadata about support conversations with Lyft; times and locations at which a trip was requested, started, and ended; distance traveled; trip prices and currency; 30 days of mobile event data, such as device OS, device model, device language, app version, and the time and location that the data was collected.

27. Given Lyft's state of the art data triangulation capabilities, it could use data pattern analysis to "red flag" miscreant passengers who are utilizing false or stolen identities or bogus payment information to hire Lyft drivers. It did not, in connection with the events alleged herein, use these

6

capabilities to keep its driver LAWRENCE J. SPINO safe from dangerous criminals on its platform.

## IV. LYFT'S PERVERSE INCENTIVES PUT DRIVERS AT RISK

28. In addition to Lyft's failure to use existing technology to screen out or flag potentially fraudulent passengers, Lyft uses a system of perverse incentives and penalties that restrict drivers' autonomy over their personal safety.

29. Lyft penalizes drivers for declining or canceling rides. For example, if a driver declines a certain percentage of ride requests, he or she risks being moved to the bottom of Lyft's queue vis-a-vis other drivers for ride requests in a busy area, such as an airport. Drivers also risk suspension or deactivation of their Lyft account for declining too many rides.

30. Lyft drivers are provided almost no information about passengers and trip details until after they accept a ride request, just the first name of the passenger, the length of the trip, and the pick-up location. Drivers are not provided with a photo of the passenger. With no photo and no full name, drivers have no way of verifying that the person who requested the ride is actually the person they pick up.

31. Lyft also creates perverse incentives to encourage the maximum number of rides.

32. Lyft offers flat bonuses or increased payouts per ride when drivers accept a certain number of rides. Because payouts to drivers are so low in relation to their time and costs, these "bonuses" or increased payouts may be the difference between profitability or not after the driver's expenses are deducted.

## V. LYFT IS A COMMON CARRIER

33. Lyft offers to carry and transport members of the general public and holds itself out to the public as an on-demand form of transportation available to anyone who wants to use it. Lyft

provides a similar service to taxis and competes with taxi services providing transportation to members of the public. As of September 2020, Lyft—through its drivers—had provided billions of rides to members of the public.

34. Lyft is available to the general public through the Lyft App for anyone to download with a smartphone. Neither drivers nor riders are charged a fee to download the Lyft App. Lyft's primary source of revenue is from charging its customers for transportation. By its own admission, Lyft wants to be available for "everyone."

35. Lyft policy prohibits drivers from refusing to provide services based on the rider's destination.

36. Lyft charges customers standardized fees for car rides, setting its fare prices without driver input. Drivers may not negotiate fares.

37. Lyft requires drivers to accept all ride requests when logged into its App or else face potential discipline. Lyft expects its drivers to comply with all relevant state, federal and local laws governing the transportation of riders with disabilities, including transporting service animals. Lyft specially instructs its drivers on accessibility for riders with disabilities.

38. The general public recognizes Lyft as a common carrier.

**VI. LAWRENCE J. SPINO SUFFERED TRAUMATIC AND PERMANENT INJURIES BECAUSE OF LYFT'S FAILURE TO USE ITS KNOWLEDGE, SUPERIOR RESOURCES, AND TECHNOLOGICAL CAPABILITIES TO PROTECT HIM FROM THE FORESEEABLE ASSAULT.**

39. On the night of June 23, 2024, LAWRENCE J. SPINO was driving for Lyft in and around Chicago, Illinois.

40. He was driving a car which met all of Lyft's safety requirements.

41. Upon information and belief, shortly after midnight, four unknown assailants ordered a ride on Lyft to be picked up in Evanston, Illinois and transported to Chicago, Illinois. The four met

together and conspired together to carjack a rideshare driver. A Lyft account was created under a false name and email address using an anonymous form of payment.

42. The four assailants did this to hide the identity of the person creating the account and requesting the ride.

43. In addition, the Lyft account had an unverified form of payment.

44. Had Lyft done any screening or background check at all, it would have found that the fictitious person who set up the Lyft account did not exist, and that the form of payment was unverified.

45. After creating the account, the four assailants used the Lyft account to request a ride.

46. Lyft knew or should have known that their drivers, including LAWRENCE J. SPINO, were targets for violent crime, including specifically carjackings.

47. Lyft knew, or should have known, that multiple rideshare drivers had been assaulted, attacked, and carjacked as a result of the same fraudulent scheme used by the assailants in this matter.

48. Lyft's app directed the request to LAWRENCE J. SPINO, who—under the threat of penalty from Lyft—accepted it and arrived at the pick-up location shortly after midnight. Four assailants, three male, one female got into the car, three in the back seat and one in the front passenger seat and they drove to 930 E 91st Street in Chicago, Illinois, where they announced a robbery and pulled guns on LAWRENCE J. SPINO, attempting to force him to get out of the car.

49. Gunfire rang out.

50. One of the assailants shot LAWRENCE J. SPINO in the back of the neck, leaving him paralyzed.

9

51. Police arrived on the scene and found LAWRENCE J. SPINO on the ground fighting for his life.

52. LAWRENCE J. SPINO, having been shot multiple times, managed to tell police his name and that he had been carjacked.

53. Despite Lyft's knowledge that its drivers, including LAWRENCE J. SPINO, are at high risk of assault and carjackings by would-be passengers, especially at night, especially in and around Chicago could save drivers' lives, Lyft did nothing to protect LAWRENCE J. SPINO. Lyft did not warn LAWRENCE J. SPINO of the known risks or train him to identify particularly dangerous situations or people, did not require a surveillance camera, GPS monitoring devices, or physical barriers between driver and passenger, and took no steps to screen or verify the identity or age of the fictitious passenger account.

54. Nor did Lyft inform LAWRENCE J. SPINO that Lyft did not screen customers, detect fraud, or otherwise use its data collection and analysis technology to protect its drivers from danger.

55. These simple and effective measures, all readily available and known to Lyft— could have protected LAWRENCE J. SPINO from serious and permanent harm.

## COUNT I – STRICT PRODUCT LIABILITY V. LYFT, INC.

56. Plaintiff incorporates the above allegations as though fully set forth herein.

57. Both at the time of design and delivery into the stream of commerce, and at the time of LAWRENCE J. SPINO's injuries, the subject Lyft app was in a defective condition and was unreasonably dangerous when put to its reasonably anticipated use in that:

  a. The subject Lyft app failed to utilize any or adequate data analysis;

  b. The subject Lyft app failed to contain adequate protection against fraud;

    c. The subject Lyft app failed to contain any passenger screening technology;

    d. The subject Lyft app failed to contain any or adequate data collection and analysis technology to protect drivers from danger;

    e. The subject Lyft app failed to require any or adequate verification from passengers concerning their age, identity, and/or violent propensity;

    f. The subject Lyft app failed to employ any or adequate GPS coordinate verification technology;

    g. The subject Lyft app failed to contain any or adequate data pattern analysis technology to identify potentially fraudulent and/or violent riders;

    h. The subject Lyft app failed to contain any or adequate data verification technology;

    i. The subject Lyft app penalized drivers for declining dangerous and/or potentially fraudulent rides;

    j. The subject Lyft app failed to warn drivers about potentially dangerous passengers and/or routes; and

    k. Such further defects as discovery and the evidence will reveal.

58. The defective and unreasonably dangerous condition of the subject Lyft app existed at the time the app was designed, manufactured, developed, tested, distributed, and/or sold by Lyft, Inc. At the time of the occurrence, the subject Lyft app was in substantially the same condition as when designed, manufactured, developed, tested, distributed, and/or sold by Lyft, Inc.

59. The subject Lyft app was used by LAWRENCE J. SPINO in a manner reasonably anticipated, and the use of the subject Lyft app was reasonably foreseeable by Defendant Lyft, Inc.

60. The defects as set forth above caused or contributed to cause LAWRENCE J. SPINO's injuries.

61. As a direct and proximate cause of one or more of said careless and negligent acts and/or omissions, LAWRENCE J. SPINO suffered serious injuries of a personal and pecuniary nature, including physical injuries, pain, suffering, loss of a normal life, disability, disfigurement, lost income, and have become obligated for treatment and other expenses. These losses have been incurred in the past and will continue to be incurred in the future. Some or all of these losses are permanent.

WHEREFORE, Plaintiff LAWRENCE J. SPINO prays that this Honorable Court enters judgment against Defendant LYFT, INC. in an amount that will adequately and fairly compensate him for his injuries, which amount exceeds FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00), plus costs, disbursements, and other relief to the extent permitted by law, including prejudgment interest.

### COUNT II NEGLIGENT DESIGN V. DEFENDANT LYFT, INC.

62. Plaintiff incorporates the above allegations as though fully set forth herein.

63. Defendant Lyft breached its duty owed to Plaintiff and others by developing and marketing the subject Lyft Application, in a defective and unreasonably dangerous condition, in that the subject Lyft application was defective and unreasonably dangerous as set forth above.

64. Additionally, Defendant Lyft failed to exercise reasonable care in the creation, design, development, testing, sale, and deployment of the Lyft application thereby breaching its duty owed to Decedent and others in one or more of the following respects:

    a. Lyft negligently and carelessly failed to design the subject Lyft application;

    b. Lyft negligently and carelessly failed to implement passenger verification technology within the subject Lyft application;

c. Lyft negligently and carelessly failed to incorporate within the Lyft application adequate or any data analysis to detect fraud;

d. Lyft negligently and carelessly failed to equip the subject Lyft application with adequate fraud protection technology;

e. Lyft negligently and carelessly failed to equip or incorporate any passenger screening technology into the subject Lyft application;

f. Lyft negligently and carelessly failed to incorporate or equip the subject Lyft application with any or adequate data collection and analysis technology to protect drivers from danger;

g. Lyft negligently and carelessly failed to equip or incorporate any or adequate verification from passengers concerning their age, identity, and/or violent propensity;

h. Lyft negligently and carelessly failed to employ any or adequate GPS coordinate verification technology;

i. Lyft negligently and carelessly failed to incorporate or equip the subject Lyft application with any or adequate data pattern analysis technology to identify potentially fraudulent and/or violent riders;

j. Lyft negligently and carelessly failed to contain any or adequate data verification technology;

k. Lyft negligently and carelessly failed to test the subject Lyft application before, during, and after the production and sale and/or delivery of the subject Lyft application to the public;

13

l. Lyft negligently and carelessly placed the subject Lyft application into the stream of commerce without incorporating technologically available safety features;

m. Lyft negligently and carelessly penalized drivers for declining rides that it knew or should have known exposed them to physical harm; and

n. Such further carelessness and negligence as discovery and the evidence will reveal.

65. As a direct and proximate cause of one or more of said careless and negligent acts and/or omissions, LAWRENCE J. SPINO suffered serious injuries of a personal and pecuniary nature, including physical injuries, pain, suffering, loss of a normal life, disability, disfigurement, lost income, and have become obligated for treatment and other expenses. These losses have been incurred in the past and will continue to be incurred in the future. Some or all of these losses are permanent.

WHEREFORE, Plaintiff LAWRENCE J. SPINO prays that this Honorable Court enters judgment against Defendant LYFT, INC. in an amount that will adequately and fairly compensate him for his injuries, which amount exceeds FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00), plus costs, disbursements, and other relief to the extent permitted by law, including prejudgment interest.

### COUNT III NEGLIGENT FAILURE TO WARN V. DEFENDANT LYFT, INC.

66. Plaintiff incorporates the above allegations as though fully set forth herein.

67. At all times relevant, Defendant Lyft owed a duty to Plaintiff and others to exercise reasonable care in the creation, design, development, testing, sale, deployment, and delivery of Lyft application. In addition, Defendant Lyft owed a duty to Plaintiff and others to exercise ordinary care to warn Plaintiff and others of the risks posed by defects in the subject Lyft application.

68. Defendant Lyft breached its duty owed to Plaintiff and others by developing and marketing the subject Lyft Application, in a defective and unreasonably dangerous condition, in that the subject Lyft application was defective and unreasonably dangerous as set forth above.

69. Lyft failed to exercise reasonable care in the creation, design, development, testing, sale, deployment of the Lyft application in that it knew of the defects listed above and failed to warn Plaintiff or others about said defects. Lyft negligently and carelessly concealed known dangers existent in the Lyft application and failed to adequately disclose those known dangers to Plaintiff and others.

70. As a direct and proximate cause of one or more of said careless and negligent acts and/or omissions, LAWRENCE J. SPINO suffered serious injuries of a personal and pecuniary nature, including physical injuries, pain, suffering, loss of a normal life, disability, disfigurement, lost income, and have become obligated for treatment and other expenses. These losses have been incurred in the past and will continue to be incurred in the future. Some or all of these losses are permanent.

WHEREFORE, Plaintiff LAWRENCE J. SPINO prays that this Honorable Court enters judgment against Defendant LYFT, INC. in an amount that will adequately and fairly compensate him for his injuries, which amount exceeds FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00), plus costs, disbursements, and other relief to the extent permitted by law, including prejudgment interest.

## COUNT IV NEGLIGENT TRAINING V. LYFT, INC.

71. Plaintiff incorporates the above allegations as though fully set forth herein.

72. At all times relevant, Defendant Lyft owed a duty to Plaintiff and others to exercise reasonable care to train him adequately to perform his job with reasonable safety.

73. Defendant Lyft failed to exercise reasonable care in providing training to Plaintiff, in that Lyft failed to adequately train Plaintiff, including but not limited to failing to train Plaintiff to identify potentially fraudulent accounts, failing to train Plaintiff to identify potentially violent situations and or potential rides, and/or how to handle carjackings or attempted violence.

74. As a direct and proximate cause of one or more of said careless and negligent acts and/or omissions, LAWRENCE J. SPINO suffered serious injuries of a personal and pecuniary nature, including physical injuries, pain, suffering, loss of a normal life, disability, disfigurement, lost income, and have become obligated for treatment and other expenses. These losses have been incurred in the past and will continue to be incurred in the future. Some or all of these losses are permanent.

WHEREFORE, Plaintiff LAWRENCE J. SPINO prays that this Honorable Court enters judgment against Defendant LYFT, INC. in an amount that will adequately and fairly compensate him for his injuries, which amount exceeds FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00), plus costs, disbursements, and other relief to the extent permitted by law, including prejudgment interest.

### COUNT V NEGLIGENCE V. DEFENDANT LYFT, INC.

75. Plaintiff incorporates the above allegations as though fully set forth herein.

76. At all times relevant, Defendant Lyft owed a duty to Plaintiff and others to exercise reasonable care so as to not endanger or harm Plaintiff or others in the operation of its business.

77. Defendant Lyft had actual knowledge that Lyft drivers, including Plaintiff, were at risk of being assaulted and/or at risk of severe and permanent bodily harm by would be passengers.

78. Defendant Lyft had actual knowledge, based on prior incidents, that certain neighborhoods in urban areas, including areas in and around Chicago, presented particular risks of harm to Plaintiff and others.

79. Despite this knowledge, Defendant failed to exercise reasonable care to prevent its drivers, including Plaintiff, from being assaulted or killed, or otherwise subject to harm from passengers, thereby breaching its duty, in one or more of the following respects:

   a. Lyft negligently and carelessly failed to adequately monitor assaults against its drivers;

   b. Lyft negligently and carelessly failed to monitor carjackings of its drivers;

   c. Lyft failed to maintain any or adequate policies or procedures to prevent assaults against its drivers;

   d. Lyft failed to maintain any or adequate policies or procedures to prevent carjackings of its drivers;

   e. Lyft failed to adequately inform its drivers of the risks inherent in driving for Lyft;

   f. Lyft failed to adequately equip its drivers with crime deterrence technologies, including but not limited to offering physical barriers, security cameras, or GPS technology; and

   g. Such further carelessness and negligence as discovery and the evidence shall reveal.

80. As a direct and proximate cause of one or more of said careless and negligent acts and/or omissions, LAWRENCE J. SPINO suffered serious injuries of a personal and pecuniary nature, including physical injuries, pain, suffering, loss of a normal life, disability, disfigurement, lost income, and have become obligated for treatment and other expenses. These losses have been

incurred in the past and will continue to be incurred in the future. Some or all of these losses are permanent.

WHEREFORE, Plaintiff LAWRENCE J. SPINO prays that this Honorable Court enters judgment against Defendant LYFT, INC. in an amount that will adequately and fairly compensate him for his injuries, which amount exceeds FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00), plus costs, disbursements, and other relief to the extent permitted by law, including prejudgment interest.

                                          Sincerely,

                                          ROMANUCCI & BLANDIN, LLC

                                          */s/ Michael D. Cerasa*
                                          Attorney for Plaintiff

Michael D. Cerasa
Isabella A. Mazzanti
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Suite 900
Chicago, IL 60654
t.: 312.253.8618
f.: 312.458.1004
mcerasa@rblaw.net
imazzanti@rblaw.net
Atty. No.: 35875

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| LAWRENCE J. SPINO, | |
| Plaintiff, | |
| v. | No.: |
| LYFT, INC.; | **Plaintiff Demands a Jury Trial** |
| Defendant. | |

## JURY DEMAND

The undersigned demands a jury trial.

Respectfully Submitted,<br>
ROMANUCCI & BLANDIN, LLC<br>
<br>
By: /s/ Michael D. Cerasa<br>
Attorney for Plaintiff

[X] Under penalties as provided by law pursuant to 735 ILCS 5/1-109 (1993), I certify that the statements set forth herein are true and correct.

Michael D. Cerasa
Isabella A. Mazzanti
**ROMANUCCI & BLANDIN**
321 N. Clark St. Ste. 900,
Chicago IL 60654
Email: mcerasa@rblaw.net
Email: imazzanti@rblaw.net
*Telephone*: 312-458-1000 / *facsimile*: 312-458-1004
Attorney No. 35875

1

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 9/17/2025 10:00 AM

FILED
7/15/2025 3:28 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L008904
Calendar, B
33575145

FILED DATE: 7/15/2025 3:28 PM 2025L008904

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

LAWRENCE J. SPINO,

Plaintiff,

v.

LYFT, INC.;

Defendant.

No.: 2025L008904

Plaintiff Demands a Jury Trial

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Michael D. Cerasa, being first duly sworn under oath, states as follows:

1. That your affiant is one of the attorneys of record for the parties in this matter.

2. That the total money damages sought in this civil action exceeds $50,000.

FURTHER AFFIANT SAYETH NOT.

Respectfully Submitted,
ROMANUCCI & BLANDIN, LLC

By: /s/ Michael D. Cerasa
Attorney for Plaintiff

[X] Under penalties as provided by law pursuant to 735 ILCS 5/1-109 (1993), I certify that the statements set forth herein are true and correct.

Michael D. Cerasa
Isabella A. Mazzanti
ROMANUCCI & BLANDIN
321 N. Clark, Suite 900,
Chicago, Illinois 60602
P: (312) 458-1000 / F: (312) 458-1004
Email: mcerasa@rblaw.net
Email: imazzanti@rblaw.net
Attorney No.: 35875